1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                    EASTERN DISTRICT OF CALIFORNIA

8
ROBERT CHARLES,                    1:11-CV-01959 GSA HC
9
              Petitioner,          ORDER DENYING PETITION FOR WRIT OF
10                                 HABEAS CORPUS
       v.
11                                 ORDER DIRECTING CLERK OF COURT TO
                                   ENTER JUDGMENT AND CLOSE CASE
12  WARDEN McDONALD,
                                   ORDER DECLINING ISSUANCE OF
13            Respondent.          CERTIFICATE OF APPEALABILITY
    _____/
14

15        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

16  pursuant to 28 U.S.C. § 2254.  The parties have voluntarily consented to the jurisdiction of the

17  magistrate judge pursuant to 28 U.S.C. § 636(c).

18                              **BACKGROUND**

19        Petitioner is currently in the custody of the California Department of Corrections and

20  Rehabilitation pursuant to a judgment of the Superior Court of California, County of Tuolumne,

21  following his conviction by jury trial on June 6, 2007, of two counts of first degree residential

22  burglary (Cal. Penal Code § 459) and one count of theft from an elder (Cal. Penal Code

23  § 368(d)).  (See Answer, Ex. A.)  Petitioner further admitted that he had a prior strike conviction

24  within the meaning of Cal. Penal Code § 667(b)-(i) and several prior felony convictions within

25  the meaning of Cal. Penal Code § 1203(e)(4).  (See Answer, Ex. A.)  Petitioner was sentenced to

26  serve a total determinate prison term of 14 years and 8 months in state prison. (See Answer, Ex.

27  A.)

28        Petitioner appealed.  On February 24, 2009, the California Court of Appeal, Fifth

                                        1

Appellate District ("Fifth DCA"), reversed Petitioner's second burglary conviction and remanded the matter to the trial court with directions to conduct a Marsden[1] hearing.  (See Answer, Ex. A.) Following remand, the trial court conducted a Marsden hearing.  (See Answer, Ex. B.)  The trial court determined that the attorney-client relationship had irreparably broken down; therefore, the court relieved defense counsel and appointed new counsel.  (See Answer, Ex. B.)  Petitioner's substitute counsel then filed a motion for new trial, which the trial court subsequently denied. (See Answer, Ex. B.)  The trial court then struck Petitioner's conviction and sentence on the second burglary count and reinstated the judgment.  (See Answer, Ex. B.)  Petitioner was then sentenced to a total prison term of 12 years.  (See Answer, Ex. B.)  Petitioner appealed again.  On March 8, 2011, the Fifth DCA affirmed the judgment in all respects.  (See Answer, Ex. B.) Petitioner then filed a petition for review in the California Supreme Court.  The petition was summarily denied.

On November 28, 2011, Petitioner filed the instant federal habeas petition.  He presents the following claims for relief: 1) He claims the trial judge was biased against him and failed to recuse herself despite Petitioner's timely requests; 2) He alleges his attorney rendered ineffective assistance in presenting his motion for new trial; and 3) He contends he was denied his right to be present at a critical stage in the proceedings when the trial court questioned Petitioner's former counsel outside of Petitioner's presence regarding witnesses and documentary evidence. On February 13, 2012, Respondent filed an answer to the petition.  On March 22, 2012, Petitioner filed a traverse.

## STATEMENT OF FACTS[2]

Holmes testified that on the morning of December 29, 2007, she was driving her Toyota RAV-4, when the clutch went out in the car. Holmes pulled to the side of the road and put on her blinkers. A passerby called for roadside assistance.

While Holmes was waiting for a tow truck to arrive, Father John drove by and stopped to help. He was accompanied by appellant. Father John informed Holmes that

---

[1] People v. Marsden, 2 Cal.3d 118 (1970).

[2] The Fifth DCA's summary of the facts in its February 24, 2009, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

appellant was a mechanic and that he could save her money on the repair of her RAV-4. Holmes had been planning to have the car towed to Modesto Toyota, where she purchased it new in 1996. Appellant suggested that Holmes write a check out to Father John in the amount of $500. Holmes wrote the check because she thought $500 sounded pretty good for getting the car repaired. After the tow truck arrived, Father John gave Holmes a ride to her house, while her car was towed to the garage at the church.

After writing the first check for $500, Holmes wrote six additional checks. The first four were made out to Father John in amounts of $240, $265, $360, and $240, and the last two were made out to appellant in amounts of $250 and $179.

Holmes had some difficulty recalling the specific circumstances under which she wrote the additional checks. With respect to the first two checks for $240 and $265, Holmes testified that she probably wrote them in her home but could not remember who asked her to write them or who she gave them to, appellant or Father John. At another point, Holmes testified that no one besides appellant ever came to her home to pick up any checks from her. Other than dropping her off at her house on December 29, 2006, the only other time Holmes could recall Father John coming to her home was when he paid her a friendly visit with his dog.

With respect to the third check for $360, which was dated January 2, 2007, Holmes testified that it was appellant's idea that she make the check out in that amount and that she gave it to him inside her home. She explained she wrote the check because he needed to purchase additional parts for the car. She further testified that it was appellant's idea that she write the fourth check for $240.

As to the final two checks for $250 and $179, Holmes testified she wrote these out to appellant at his request inside her home. Holmes confirmed that appellant never showed her any paperwork or receipts to support the amounts for which he was having her write checks.

Holmes recalled there was one other time she gave appellant money but stated she had no record of the occasion. Holmes testified that she contacted appellant because she needed to pick up a prescription at the pharmacy and still did not have her car. Appellant offered to pick up the prescription for her. Holmes gave him about $40 in cash for the prescription and gasoline, plus another $240 or $260 in cash for his work on her car. However, appellant never returned with the prescription.

Holmes testified that she told her friend Penny White about all the checks she was writing. Shortly thereafter, Penny's husband went to the church and Holmes's car was driven back to Holmes's house. Holmes testified that the car was not fixed at that point. She later had it towed to Modesto Toyota for repairs.

Penny White testified that she found out Holmes was having car problems when she visited Holmes on New Year's Eve. During the visit, Penny went to the restroom. When she came out, appellant was in the living room talking to Holmes about her car. Appellant said he had replaced the clutch and found shavings in the transmission, indicating it also needed to be replaced. Appellant said he was deciding whether to put in a new or rebuilt transmission.

Later during the week, Penny learned that Holmes's car was still in the shop. Penny started to wonder if it was a scam. She called the church that Sunday but was unable to reach Father John and left him several messages. She finally got in touch with the priest on the morning of Monday, January 8, 2007. The same night, appellant brought Holmes's car back to her house. Appellant said he had put another transmission into the

3

car, which he had obtained from the Oakdale wrecking yard. Penny asked appellant if he had the receipts. Appellant replied that he did not have them with him and that they were all back at his shop.

Penny's husband, Mark White, testified that he became involved in the situation on January 8, 2007. On that date, Mark went to Holmes's residence around 4:00 p.m. to see if she had gotten her car back. When he discovered her car had not yet been returned, Mark drove with Holmes over to the church around 5:00 p.m. Father John was not there but an assistant got the priest on the phone and Mark spoke with him.

Mark drove Holmes back to her house and then returned to the church around 6:00 p.m. He waited 30 to 40 minutes for Father John to arrive. Appellant showed up about an hour later. Appellant was driving Holmes's RAV-4. Mark described the car as "limping into the lot."

When Mark got out of his truck to confront appellant, appellant appeared intoxicated. Mark explained that he smelled alcohol on appellant's breath, and that his speech was slurred and his eyes were glassy. Appellant started offering excuses for why he did not have the car back. Appellant said he was having problems getting the clutch to disengage and that he had to do something else. Appellant also insisted repeatedly that he was almost done with the repairs.

After appellant drove the RAV-4 back to Holmes's house, appellant explained there were shavings in the transmission and that he had replaced it with a transmission that he had purchased from Oakdale Auto Wreckers for $600.

Mark then drove appellant back to the church because appellant indicated he had spare parts for the RAV-4 still sitting in the garage. Mark asked appellant where the transmission was that he had taken out of the car. Appellant responded that he "had to turn it in for a core charge." It was Mark's understanding that "[a] core charge means a part you've taken out of the vehicle, a used part, you have to take it back to exchange it for a part you've gotten." When they got to the garage at the church, appellant gave Mark a box containing a clutch and a sleeve that went under the transmission.

On January 12, 2007, Tuolumne County Sheriff's Deputy Daniel Brocchini spoke with appellant about Holmes's car. Appellant told Deputy Brocchini that he replaced the clutch, the slave cylinder, and the transmission. Later, appellant changed his statement and said he repaired the transmission but did not replace it.

Deputy Brocchini asked appellant if he had any receipts for corroboration. Appellant responded that he could not find all the receipts at that time. Appellant showed the deputy a receipt with a dollar amount of under $50. The receipt just had a parts number on it and the deputy could not tell what type of part it was for. Deputy Brocchini asked appellant to look for the paperwork and provide it to him later, but appellant never did.

On cross-examination, Deputy Brocchini testified that Holmes told him that Father John came by her house two times asking for money. Deputy Brocchini attempted to contact Father John by calling and coming to the church but was unable to get a statement from him. The one time he was able to get Father John on the phone, the priest hung up on him after he identified himself as a deputy.

Michael Wilson, the assistant service manager of Modesto Toyota and a master diagnostic technician, testified that Holmes had brought her RAV-4 into the dealership regularly for service since the time she purchased the car. Wilson looked at the car after it

was brought into the dealership in January 2007, and was placed up on the rack. Wilson testified that the transmission appeared to be the original. Wilson explained that the RAV-4 transmission was a rare transmission and that it was a tough transmission to get out of a vehicle. Wilson could normally tell if a transmission had been replaced with a transmission that came from the dealership or from a wrecking yard. Transmissions from wrecking yards are specially marked with paint. Wilson saw no such markings on the transmission in Holmes's car.

Stanley Hamamoto, an automobile technician with Modesto Toyota, first worked on Holmes's RAV-4 on January 12, 2007. To make the car drivable, they replaced the pressure plate, clutch disk, release bearing, and resurfaced the fly wheel. All the repairs were completed in a single day.

Before performing the repairs, Hamamoto inspected the RAV-4. Hamamoto testified that the car "looked like it was half torn apart, not put together at all." Hamamoto explained that the air cleaner box was missing, brackets were not positioned in the right places, and the air boot was dangling off the throttle body. He also found a ballpoint pen cap shoved into the rod that came out of the slave cylinder. Hamamoto had never seen anything like that before. Hamamoto surmised that the person who did it might have been "trying to get an extra amount of throw on the clutch fork...." However, it would not have helped but instead would have been "applying pressure to the fork all the time...." There was no purpose for it to be there.

Inside the car, Hamamoto found bolts were missing around the bell housing. He pulled down the transmission to further inspect the clutch, and found the bolts were not tightened properly and the pressure plate was not bolted down correctly, something that would cause the clutch not to work.

The transmission in the RAV-4 appeared to Hamamoto to be the original transmission that came with the car. It also did not appear to be in a condition where it would need to be replaced. Hamamoto testified that the Toyota RAV-4 had an unusual transmission and that heavy equipment was required to remove the transmission and support the engine.

According to Hamamoto, Holmes's RAV-4, "[l]ooked as if someone was just trying to hokey it all together." When asked if it looked like any repair work had actually been done, he responded: "It looked like it was taken apart and not completely taken down to get to the problem." Hamamoto was unsure but expressed doubt as to whether any new parts had been put in the car, explaining, "all we did is replace the clutch on it, and she was good to go on the road."

Father John testified that on December 29, 2006, he was giving appellant a ride somewhere because appellant did not have a license. They stopped to help Holmes when they saw her car parked by the side of the road. Appellant looked under the hood and said it was something very simple and suggested that when the tow truck arrived, Holmes have it towed back to the garage where his tools were. Father John drove Holmes back to her house, where she wrote him a check for parts. Because appellant did not have a bank account, Father John deposited the check in his account and drew out the cash for appellant. Father John recalled that he visited Holmes on one other occasion with his dog.

Father John testified that appellant spent a lot of time in the garage working on Holmes's car. He also confirmed that four additional checks written by Holmes were deposited into his bank account and cashed for appellant.

Father John recalled telling the district attorney investigator that he never saw any

paperwork, receipts, or invoices verifying any parts purchased for Holmes's car. However, he testified that appellant did show him a receipt from Kragen Auto Parts in relation to the clutch on Holmes's car.

On cross-examination, Father John testified that he remembered one time picking something up at Kragen Auto Parts and another time taking appellant to Jamestown to buy car parts. But he did not know whether these purchases were for Holmes's car. Father John also testified that he could not recall ever hanging up on Deputy Brocchini.

The district attorney investigator, Jeffrey Snyder, testified that he and Father John drove out to the residence in Jamestown where Father John said he took appellant to pick up auto parts. The residence consisted of a trailer with kittens on the front porch. Nobody answered the door and they could not find anybody to inquire about whether an auto parts business was being conducted from the residence.

*The Defense*

Appellant testified and admitted he had pled guilty to forgery in 1982, grand theft in 1984, second degree robbery in 1993, and petty theft with a prior in 1995.

Appellant confirmed that in December 2006, he was living at the Catholic church where Father John was the pastor. He had lived there for six years and worked on cars there for about five years. Appellant testified that, in terms of fixing cars, he could do "[e]verything but paint" and was able to fix clutches and transmissions.

Appellant testified that he had known Father John for 10 years. They met after appellant got out of prison and moved to the area with his wife. Appellant worked on all of Father John's cars. Appellant did not have a driver's license and depended on other people to drive him around to get auto parts. Appellant had gotten parts from Oakdale Auto Wreckers for Father John's cars.

Appellant testified that he spotted Holmes on the side of the road with her emergency flashers on and asked Father John to stop to see if she was alright. According to appellant, he did not talk to Holmes that evening. Father John walked up to Holmes's car, while appellant stayed inside Father John's car.

When Father John returned to get his cell phone, appellant asked what was going on. Father John said Holmes could not seem to get her car into gear. Appellant offered to take a look at it. As soon as he walked up to her car, he could smell the clutch. When he put his foot on the clutch, it went all the way down to the floor. He popped the hood and looked inside for the clutch cylinder. Based on the smell, appellant could tell that either the slave cylinder or the clutch was bad. Appellant told Father John he could fix the car. Father John then spoke with Holmes. After the tow truck arrived, Holmes's car was towed to appellant's shop.

When Father returned from dropping Holmes off, he told appellant she had given him a check for $500 and that he would deposit into his account and get appellant the part he needed for the car. According to appellant, Father John went and bought a clutch kit for him, which included a clutch plate, throw-out bearing, and slave cylinder. Appellant was pretty sure the clutch kit came from Kragen Auto Parts. Appellant thought the clutch kit was "garbage." It was incomplete and had no clutch disk. In order to inspect Holmes's car, appellant had to move the engine, take the bolts off it, and back the transmission off from the motor. It was a very arduous task and took him about 22 hours. When he got it off, appellant saw the clutch was damaged.

6

The first time appellant went to Holmes's house, Father John gave him a ride. Appellant went to talk to Holmes about the repairs he needed to perform on her car. Using the car's manual to aid his explanation, appellant told Holmes that the transmission was bad and that it was going to take more money to fix everything. While he was talking to Holmes, Penny White walked in. Appellant explained to both of them that the transmission needed a new cluster gear, which was very expensive. Holmes said she could not pay him until the first of the year but Penny told him to go ahead and do the work. According to appellant, at this point, he had not received any money for the car, including from the $500 check Holmes initially paid to Father John.

After this conversation with Holmes, appellant started to look for a cluster gear. Appellant could not afford a new cluster gear, which would have cost around $1,500. He eventually obtained a cluster gear from his friend Nick Ricard, who raced Toyotas. Appellant traded Ricard a straight axle for the cluster gear. After appellant got the cluster gear, he "[s]tarted tearing that transmission apart." When he opened it up, he knew there was a problem because it had shavings in it. He also noticed the gears were broken.

The second time appellant went to see Holmes was when she needed a prescription. Appellant claimed that he had his friend Hobbs drive him to Holmes's house to pick her up. On their way to pick up the prescription, Hobbs's jeep ran out of gas and started coasting down a hill. Appellant started to panic because the 93-year-old Holmes was in the car. They drove back to her house, and Holmes gave appellant a check for her prescription and another for work on the car and for gas. According to appellant, these were the only two checks she ever wrote to him and they were never cashed.

Appellant denied that he ever went to Holmes house and picked up the checks she had written to Father John. Appellant was unaware of those checks. When asked if Father John gave him any money from such checks, appellant testified: "No, ma'am. He's been stealing from me for a long time, and my family. He's in love with my wife. That's what this is all about."

With respect to the work on Holmes's car, appellant testified he was "fighting to get that car done" and that "it wasn't easy." Despite his years of experience, and his usual ability to repair a clutch in about six hours, this one was not like any he had worked on before. The clutch was difficult to get out of the car, and he had to do the work on his back. It was also difficult to take the transmission out and put it back in.

Appellant testified that on the night Mark White came to the church, appellant had taken Holmes's car to Rocky's Automotive because they had a rack that he could put the car up on. When it was up on the rack, he "[t]ried like hell to get that clutch to disengage." He then drove back to the church.

When appellant arrived, Mark jumped out of his truck and started screaming and yelling at appellant. Mark accused appellant of taking advantage of Holmes and asked why her car was not fixed. Appellant denied that he was intoxicated when Mark confronted him and claimed to be a nondrinker. Appellant told Mark he was not done putting the car together. Although there was only one bolt holding the transmission up against the engine, Mark demanded that appellant drive the car to Holmes's house. Appellant told Mark it was not finished, and handed him a bunch of nuts and bolts and parts for the car. When asked what they went to, appellant testified, "The bell housing, transfer case assembly, all the brackets that hold the transmission and the centered difference in place."

Appellant further testified that he did not replace the transmission in Holmes's car and that there was no reason to replace the transmission. Appellant also denied telling

anyone that he replaced the transmission. He only told Mark that he received parts from another transmission.

Appellant confirmed that he placed the ballpoint pen cap inside the car, explaining: "I was by myself in the shop and I wasn't sure if I could bleed off the cylinder correctly. But what I did is put that pen cap on that rod only temporarily to try to take up some of the slack and the play in the pedal to see if I could get that clutch to disengage, because sometimes, you'll have a bad slave cylinder or you might have just the slightest amount of air in there and it won't disengage."

On cross-examination, appellant denied stating that he had gotten a transmission from Oakdale Auto Recyclers, or that he had traded in Holmes's transmission for a core charge.

Appellant also claimed he had a receipt for the clutch kit Father John purchased for him at Kragen Auto Parts. When asked where it was, appellant responded, "[w]ith your most wonderful Deputy [Brocchini]...." Appellant further claimed to have given all the receipts he had to Deputy Brocchini, and that the deputy lied when he said appellant showed him only one receipt reflecting an amount under $50.

(See Answer, Ex. A.)

## DISCUSSION

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Tuolumne County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II.   Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

(2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

. . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), quoting Wright v. Van

Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must

then consider whether the state court's decision was "contrary to, or involved an unreasonable

application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, quoting 28

U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

1    Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

2         AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

3    is limited to the record that was before the state court that adjudicated the claim on the merits,"

4    and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

5    Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011). "Factual determinations by state

6    courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

7    Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1). However, a state court

8    factual finding is not entitled to deference if the relevant state court record is unavailable for the

9    federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

10   Tamayo-Reyes, 504 U.S. 1 (1992).

11   III.   Review of Claims

12          A.  Judicial Bias

13        Petitioner first alleges the trial judge was biased against him and failed to recuse herself

14   despite Petitioner's several requests.  He contends the judge's failure to recuse herself violated

15   his due process rights to a fair trial and an impartial trial judge as guaranteed by the Constitution.

16        This claim was presented in Petitioner's second direct appeal to the Fifth DCA. (See

17   Answer, Ex. B.)  The claim was rejected in a reasoned decision.  (See Answer, Ex. B.)  Petitioner

18   then raised the claim to the California Supreme Court, where it was denied without comment.

19   When the California Supreme Court's opinion is summary in nature, the Court must "look

20   through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker,

21   501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the

22   claim as follows:

23              No formal disqualification motion was ever made in the proceedings below.
         However, during the Marsden hearing, appellant twice accused the trial court judge of
24       being biased and three times demanded that she recuse herself.[FN5] Now appellant
         contends that his right to due process was violated because the proceedings on remand
25       were conducted by a judge who was biased against him.

26              FN5. For example, after the court indicated that it was granting the Marsden
         motion on the alternative ground of a breakdown in the attorney-client
27       relationship, appellant asserted: "You're crazy. You know, Miss Provost, I am-I
         want you to recuse yourself because you're biased. You can't send me-you're not
28       going to deny me a Marsden. I got it all on record."

Due process guarantees a defendant a trial by a fair and impartial judge. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309 .) A violation of that right constitutes a "structural defect[ ] in the constitution of the trial mechanism" and the resulting judgment is reversible per se. (*Ibid.; People v. Brown* (1993) 6 Cal.4th 322, 332.) A defendant's due process bias claim may be raised on appeal for the first time. (*Brown, supra,* at p. 334-335.)

The thrust of appellant's bias argument is that the record demonstrates that, from the very beginning of the proceedings on remand, the trial court had prejudged his ineffective assistance claim and concluded it would deny any motion for a new trial on that ground. We disagree with appellant's interpretation of the record. First, for reasons discussed above, we reject appellant's claim that the court's bias against him was demonstrated by its denying him a full opportunity to state his reasons for desiring new counsel. The court did not deny him such opportunity. The record shows the court made an earnest effort to inquire into appellant's specific claims of incompetency, and that appellant's disruptive conduct undermined the court's ability to hold a meaningful inquiry in his presence. After appellant was removed from the courtroom, the court questioned counsel in a neutral tone and objective manner. There was no indication of bias on the court's part.

Second, appellant's selective citation to comments by the trial court at the time of the *Marsden* hearing does not demonstrate that the court was biased against him or had prejudged his later motion for a new trial. Appellant cites, among others, the comments mentioned above in which the court stated it was not finding ineffective assistance of counsel or granting appellant a new trial. As discussed, this was not evidence the court had determined in advance to deny any subsequent motion for a new trial based on the ground of ineffective assistance of counsel. The court's comments accurately described where the case stood at the conclusion of the *Marsden* hearing. When appellant continued to insist that he was entitled to a new trial and had exonerating evidence to show the court, the court properly advised him to "show it to your lawyer."

Third, we reject as evidence of bias the trial court's denial of appellant's request to testify at the hearing on the motion for a new trial or its refusal to look at documentary evidence appellant claimed to have in his possession at the time of that hearing. As discussed below, the court acted well within its discretion and we do not believe the court's proper exercise of discretion demonstrated bias against appellant.

(See Answer, Ex. B.)

Under the Constitution, a defendant is guaranteed the right to a trial by a fair and impartial judge. Arizona v. Fulminante, 499 U.S. 279, 309 (1991); Tumey v. Ohio, 273 U.S. 510 (1927). A violation of this right is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Id. at 310. Without basic protections such as an impartial judge, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Id. at 310, *quoting* Rose v. Clark, 478 U.S. 570, 577–578 (1986).

In the instant case, the state court reasonably determined that the trial judge was not

biased against Petitioner.  There is simply nothing in the record which indicates any partiality on

the part of the judge.  Petitioner points to various statements made by the judge throughout the

course of the trial, but as the appellate court noted, all of these statements were made consistent

with the exercise of proper discretion by the judge.  Indeed, the trial court demonstrated a sincere

effort to inquire into Petitioner's various complaints despite his disruptive conduct.  Moreover,

"judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."

Liteky v. United States, 510 U.S. 540, 555 (1994).

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The claim must be denied.

B.   Ineffective Assistance of Counsel

Petitioner next alleges he was denied the effective assistance of counsel in the

presentation of Petitioner's motion for new trial by his newly appointed counsel.  He contends

that while counsel did present a motion for new trial based on prior counsel's alleged ineffective

assistance, Petitioner's new counsel failed to cite appropriate cases, failed to distinguish the

nature of the motion from what the prosecutor erroneously but successfully contested was a

motion based on newly discovered evidence, and failed to make meaningful offers of proof as to

what evidence prior counsel had failed to introduce at trial.

This claim was also raised in the second appeal to the Fifth DCA where it was rejected in

a reasoned decision.  Petitioner then raised the claim to the California Supreme Court, and it was

denied without comment.  Therefore, this Court must "look through" to the appellate decision

below.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA denied the claim as follows:

> Appellant contends the matter must be remanded for another hearing on his
> motion for a new trial because, due to its erroneous belief that the motion was based on
> the statutory ground of newly discovered evidence (§ 1181, subd. (8)), the trial court
> failed to consider the nonstatutory ground of ineffective assistance of counsel on which
> the motion was actually (if implicitly) based. We reject appellant's contention because the
> record shows the trial court duly considered the grounds offered in support of the motion
> and rejected them.
>
> The record reveals that a little over a month after the *Marsden* hearing, appellant's

new attorney filed a motion for a new trial on the nonstatutory ground that appellant "was denied a fair trial under the provisions of [*People v. Oliver* (1975) 46 Cal.App.3d 747, 751 (*Oliver*)]." No declarations or evidence were offered in support of the motion. The supporting points and authorities simply asserted:

"It is Mr. Charles' contention that the bank records of Father Fitzgerald were not introduced showing that no money was ever received by Mr. Charles. Additionally, there was proof of purchase of a clutch kit at Kragen's which for some reason was not introduced into evidence. Mr. Charles was not provided with an expert witness on his behalf to verify his explanation of the transmission/clutch problems. Finally, there was no elucidation of the fact that although Toyota apparently made repairs in one (1) day they had the vehicle for a longer period of time than had Mr. Charles."

In his written response to appellant's new trial motion, the prosecutor argued that this case bore no resemblance to the one cited by appellant in support of his motion. (See *Oliver, supra*, 46 Cal.App.3d at p. 749 [appellate court affirmed lower court order granting new trial "because an improper, erroneous and prejudicial comment by the trial judge in the course of jury instructions deprived [the defendant] of a fair trial"].) The prosecutor further argued:

"The People will assume that the defendant is also seeking a new trial pursuant to Penal Code section 1181, subdivision 8. That section permits a new trial '[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial.' [¶] ... [¶]

"In this case the defendant argues that bank records of Father Fitzgerald and a receipt from Kragen's were not introduced into evidence, and that the lack of expert witness and a failure to elicit other facts all combined to deprive the defendant of a fair and impartial trial. Absent from the pleading is any proof that such evidence exists, that such evidence is credible as well as any representation that such evidence is material and would result in a different verdict upon a retrial.

"In addition this evidence, assuming its existence and credibility for argument's sake, appears to have been known to both the defendant and his attorney at the time of the original trial and is therefore not new evidence. It is quite logical to assume that its exclusion at trial was due to a tactical decision on the part of trial counsel."

During the hearing on the new trial motion, the arguments of the parties focused largely on the question of whether appellant was prejudiced by the alleged failure of the defense to present the evidence cited in the new trial motion. After listening to the arguments of counsel, the trial court briefly ruled as follows: "I do not feel, first, that this is anything newly discovered. And second, I don't feel that it would have made a darn bit of difference in what the jury decided in this case, and I'm going to deny the motion."

We find no basis in the record for concluding the trial court was unaware that appellant's motion for new trial was implicitly based on the nonstatutory claim that appellant's trial counsel rendered ineffective assistance of counsel, or that the court restricted its consideration to the issue of whether the evidence constituted newly discovered evidence within the meaning of section 1181, subdivision (8), a statutory ground not put forth in appellant's written motion but discussed in the prosecutor's response. Although defense counsel did not expressly use the term "ineffective assistance of counsel" in connection with the motion for a new trial, the substance of the motion sets forth an ineffectiveness claim. The supporting memorandum of points and authorities specifically stated that appellant was seeking a new trial on "nonstatutory grounds" that

"caused the denial of a fair trial" and then went on to identify alleged evidentiary omissions by the defense.[FN6] During the subsequent hearing on the motion, both defense counsel and the prosecutor referred to "tactical decisions" made by appellant's former counsel not to present certain evidence, and discussed whether those decisions prejudiced appellant. Finally, the fact the court listened to extensive arguments on the issue of prejudice and commented that it did not believe the alleged evidentiary omissions would have made a difference in the outcome of the trial, belies appellant's suggestion that the trial court's ruling was based solely on the consideration of whether the evidence was newly discovered and indicates the court did in fact consider appellant's argument that he was deprived a fair trial as a result of the alleged omissions of counsel.

> FN6. Although ineffective assistance of counsel is not one of the statutory grounds for a new trial, "the statute should not be read to limit the constitutional duty of trial courts to ensure that defendants are accorded due process of law. 'Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.' [Citations.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) Accordingly, in additional to the statutory grounds (§ 1181), a new trial may be granted where the trial court finds that the defendant received ineffective assistance of counsel. (*Fosselman, supra,* at pp. 582-583.)

Appellant also faults the trial court for not allowing him to testify at the hearing on the motion for a new trial and for not looking at evidence he offered to show the court during the hearing. In this regard, the record shows that, at the beginning of the hearing, defense counsel told the court that he wished to address the motion "by way of argument" and then, if the court were "inclined," he would call appellant "to elaborate on the points. The court responded, "No, I won't be doing that." Counsel did not object but agreed that he could "explain them." The court then added, "This is a motion, this is not a testimony deal." After defense counsel and the prosecutor made their arguments for and against the new trial motion, appellant interjected the following:

> "Miss Provost, I have Fr. Fitzgerald bank account, and it shows the purchase of parts from Kragen's and it shows the deposit of all his checks. And I got proof and an affidavit showing a thousand dollars that I said I gave him. I've got proof that I worked on that transmission that [the prosecutor] says was rebuilt. It was repaired. I've got proof of everything. I have receipts in my attorney's hand. Everything. [¶] ... [¶] Everything. I'm innocent. I'm innocent." After speaking briefly with appellant off the record, defense counsel offered to show the trial court the receipts appellant shared with him, but the court declined to look at them, and made its ruling denying the motion for a new trial.

Appellant now suggests the trial court abused its discretion by not letting him testify and by declining to look at the receipts defense counsel offered to show the court. Appellant complains the court "flatly denied [defense counsel] any opportunity to present the materiality of appellant's evidence by refusing to allow appellant to testify or to consider looking at the receipts which were literally in counsel's hand." Appellant further contends:

> "[T]he refusal of the court to look at appellant's receipts offered by [defense counsel] in the context of a motion for a new trial based upon ineffective assistance of counsel is simply unaccountable. The court's refusal to examine the receipts is indeed 'irrational or arbitrary' as well as not 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citations.]"

"As in other motion practice [citation], the motion for new trial is usually supported by affidavits, although the judge doubtless has discretion to allow oral testimony. [Citations.]" (6 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Criminal Judgment, § 116, p. 147.) Here, we cannot find that it was an abuse of discretion for the court to decline to hear appellant's testimony or to consider evidence he spontaneously offered to show the court at the conclusion of the hearing on his motion for a new trial. Appellant made a similar protestation of innocence and claims to have exonerating evidence at the time of the *Marsden* hearing. The court advised appellant to show the evidence to his new counsel. Despite the court's advice and having over a month to prepare the motion for a new trial, appellant's motion was submitted without any supporting affidavits confirming the existence of evidence supporting his ineffectiveness claim. Under these circumstances, it was reasonable for the court to treat with circumspection appellant's offer to testify and present the court with documentary evidence. Appellant has not demonstrated the court's exercise of discretion here was arbitrary or irrational. For all these reasons, we reject appellant's challenge to the trial court's handling of his new trial motion.

. . . .

Finally, appellant contends that his new counsel rendered ineffective assistance in presenting his motion for a new trial. Specifically, appellant argues: "[Defense counsel], although having plainly filed a motion for a new trial based upon prior counsel's ineffective assistance, failed to cite appropriate case authority to support the motion, failed to distinguish the nature of the motion from what the prosecutor erroneously but successfully contended was a motion based upon newly discovered evidence, and failed to make meaningful offers of proof as to what evidence prior counsel had failed to introduce at trial." Appellant's ineffective assistance claim is unavailing. It is axiomatic that when the record on appeal fails to disclose why counsel failed or failed to act in the manner challenged, we must affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Here, the record is silent with respect to counsel's challenged actions. "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

(See Answer, Ex. B.)

The law governing ineffective assistance of counsel claims is clearly established. Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Harrington v. Richter, *supra*, 131 S.Ct. at 787; Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and must identify counsel's alleged acts or omissions that were not the result of

16

1   reasonable professional judgment considering the circumstances. Harrington, 131 S.Ct. at 787,

2   citing, Strickland, 466 U.S. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th

3   Cir. 1995). Petitioner must show that counsel's errors were so egregious as to deprive defendant

4   of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. Judicial scrutiny of

5   counsel's performance is highly deferential. A court indulges a "'strong presumption' that

6   counsel's representation was within the 'wide range' of reasonable professional assistance."

7   Harrington, 131 S.Ct. at 787, quoting, Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d

8   1446, 1456 (9th Cir.1994).

9   Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

10  reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

11  different," Strickland, 466 U.S. at 694. "It is not enough 'to show that the errors had some

12  conceivable effect on the outcome of the proceeding.'" Harrington, 131 S.Ct. at 787, quoting,

13  Strickland, 466 U.S. at 693. "Counsel's errors must be 'so serious as to deprive the defendant of

14  a fair trial, a trial whose result is reliable.'" Harrington, 131 S.Ct. at 787-788, quoting,

15  Strickland, 466 U.S. at 687. A court need not determine whether counsel's performance was

16  deficient before examining the prejudice suffered by the petitioner as a result of the alleged

17  deficiencies. Strickland, 466 U.S. at 697. Since the defendant must affirmatively prove

18  prejudice, any deficiency that does not result in prejudice must necessarily fail.

19  Establishing that a state court's application of Strickland was unreasonable under 28

20  U.S.C. § 2254(d) is very difficult. Harrington, 131 S.Ct. at 788. Since the standards created by

21  Strickland and § 2254(d) are both 'highly deferential,' when the two are applied in tandem,

22  review is 'doubly' so. Harrington, 131 S.Ct. at 788, quoting, Knowles v. Mirzayance, 556 U.S.

23  111, 123 (2009).

24  In this case, the state court reasonably rejected the allegation that defense counsel had

25  rendered ineffective assistance with respect to the motion for new trial. Petitioner faults counsel

26  for failing to cite relevant authority and clarify that his motion was based on alleged ineffective

27  assistance of prior counsel. While the motion may not have specifically stated the words

28  "ineffective assistance," the substance of the motion set forth an ineffectiveness claim.

1  Moreover, the record shows defense counsel did raise arguments concerning the alleged

2  ineffective assistance during the hearing, and the trial court was very aware that the motion was

3  based at least in part on that ground.  In fact, there was argument concerning the tactical

4  decisions of prior counsel in presenting or failing to present certain evidence, and the trial court

5  listened to extensive argument regarding the issue of prejudice, finally determining that the

6  evidentiary omissions would not have aided Petitioner in any respect.

7      As to Petitioner's claim that counsel failed to present certain evidence that Petitioner

8  placed in counsel's hand at the hearing, the appellate court noted that counsel did alert the trial

9  court to this evidence but the trial court denied his request.  Later, Petitioner interposed his

10  request to show the trial court his evidence after counsel had made his own arguments, but the

11  trial court again denied the request to consider the evidence.  Petitioner states counsel should

12  have investigated these evidentiary issues prior to the hearing; however, he fails to demonstrate

13  how the evidence would have altered the outcome in any way.

14      The state court reasonably determined that counsel did not render ineffective assistance.

15  Petitioner's allegations do not overcome the strong presumption that counsel acted within the

16  wide range of professional assistance.  In addition, Petitioner fails to demonstrate any prejudice

17  resulted from counsel's alleged omissions.  There is no reasonable probability that citation to

18  authority or further argument would have changed the outcome, nor does Petitioner show how

19  further investigation into these issues would have changed the outcome.

20      The state court rejection of this claim was not contrary to, or an unreasonable application

21  of, clearly established Supreme Court precedent as set forth in Strickland v. Washington, 466

22  U.S. 668 (1984). See 28 U.S.C. § 2254(d)(1). The petition must be denied.

23      C.  Right to be Present at Critical Stage

24      In his third and final claim for relief, Petitioner alleges he was denied his right to be

25  present at a critical stage in the proceedings when the trial court questioned defense counsel

26  regarding evidence and witnesses outside of Petitioner's presence.

27      As with the previous two claims, this claim was presented in the second appeal to the

28  Fifth DCA and denied in a reasoned decision.  It was then raised to the California Supreme Court

1   and denied without comment.  Therefore, this Court must "look through" to the appellate

2   decision below.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA provided the following

3   preliminary facts:

4           Following remand, the trial court conducted a *Marsden* hearing as directed.
    During the hearing, the court attempted to make an inquiry of defense counsel concerning
5   appellant's specific allegations against counsel. The trial court's efforts were thwarted by
    appellant's disruptive conduct, which included yelling, constantly interrupting and talking
6   over both the court and counsel, making tangential arguments and personal attacks on
    counsel, and ignoring the court's repeated orders to stop talking. Ultimately, the court
7   abandoned its attempt to question counsel in appellant's presence and granted the
    *Marsden* motion on the alternative ground mentioned in our prior opinion; i.e., that
8   appellant and counsel had become embroiled in such an irreconcilable conflict that
    ineffective assistance of counsel was likely to result. Appellant's new counsel was
9   thereafter given an opportunity to investigate possible grounds for a new trial. After a
    new trial motion was made and denied, the trial court reinstated the judgment, striking
10  appellant's conviction and sentence on count 3. All of the trial court's actions were in
    accordance with the directions of our prior opinion.

11

12          We see no support in the record for appellant's assertion that the trial court did not
    give him a full opportunity to state his reasons for desiring new counsel. Rather, the
13  record shows the court permitted appellant to speak at length before stopping him in order
    to give defense counsel an opportunity to respond to some of the specific allegations
14  appellant had made against her so far. It was not improper for the court to exercise control
    over the proceedings in this manner. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 951
15  [trial court has inherent as well as statutory discretion to control proceedings].) Appellant
    has cited no authority for his suggestion that, in order to fulfill its duty under *Marsden,*
16  the court was required to allow him to speak for as long as he wanted before questioning
    counsel. Appellant was only entitled to an *opportunity* to state his reasons for desiring
17  new counsel, which he was given; he was not entitled to hijack the proceedings or dictate
    to the court how to run the hearing. Moreover, there is no indication the court would not
18  have listened to additional reasons for desiring new counsel if appellant had not been
    disruptive and prevented the court from making a meaningful inquiry into his claims.

19          In short, our independent review of the record reveals that the trial court attempted
    to conduct a focused and orderly *Marsden* inquiry into appellant's specific claims of
20  inadequate representation as directed by our prior opinion. To the extent appellant was
    unable to present his reasons for desiring new counsel as fully as he might have liked, it
21  was due to his own disruptive conduct during the hearing and not to any failure by the
    trial court to follow our directions on remand.

22
    (See Answer, Ex. B.)
23
    The Fifth DCA then analyzed and rejected the claim as follows:
24
25          After the trial court granted appellant's *Marsden* motion to appoint substitute
    counsel, appellant continued to be disruptive and frequently interrupted the trial court to
26  challenge what he perceived to be a denial of his motion and to assert other alleged
    violations of his rights by the court. When appellant persisted in ignoring the court's
27  repeated orders to stop talking, the court ordered appellant removed from the courtroom.
    The court then gave appellant's former counsel an opportunity to make a record of her
28  responses to specific allegations of inadequacy raised by appellant, including her alleged
    failure to investigate and present specified items of potentially exonerating evidence.[FN4]

FN4. The trial court stated, in pertinent part: "Here is what you're going to do, [bailiff]: Remove this client. I want to talk to [defense counsel] and I want to be able to make an appropriate record as to what she did, and I can't do that with him in the courtroom yelling."

After questioning counsel and listening to her explanations, the trial court indicated that appellant should be brought back and reiterated that it was granting the *Marsden* motion on the alternative basis that appellant's relationship with defense counsel had irreparably broken down. Appellant now claims that, by having him removed from the courtroom while the court questioned defense counsel, the court essentially held a closed hearing in which it resolved appellant's ineffective assistance of counsel claims. As a result, appellant contends, the trial court violated his right to be personally present and his right to be represented by counsel during a critical stage of the proceedings.

A criminal defendant has a statutory and constitutional right to be present during such phases of trial as are important to his or her defense unless he or she is voluntarily absent. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; Pen.Code, §§ 977, subd. (b)(1) & (2), 1043, subds. (a) & (b); *People v. Freeman* (1994) 8 Cal.4th 450, 511; *People v. Chavez* (1980) 26 Cal.3d 334, 357-358.) However, "'A defendant ... "does not have a right to be [personally] present at every hearing held in the course of a trial." [Citation.]'" (*People v. Cleveland* (2004) 32 Cal.4th 704, 741.) More specifically, under the due process clause of the Fourteenth Amendment, a criminal defendant does not have a right to be personally present at a particular proceeding unless the proceeding is "'critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 742.) Similarly, under the California Constitution, "'"[T]he accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him.... [Citation.]" [Citation.]'" (*People v. Davis* (2005) 36 Cal.4th 510, 530.)

In addition, a criminal defendant is entitled under the federal and state Constitutions to the assistance of counsel at all critical stages of the proceedings. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Doolin* (2009) 45 Cal.4th 390, 453.)

Because the right to be present during all critical stages of the proceedings and the right to be represented by counsel are of federal constitutional dimension, remand is required here unless the violation of those rights is shown to be harmless beyond a reasonable doubt. (*People v. Robertson* (1989) 48 Cal.3d 18, 62; *People v. El* (2002) 102 Cal.App.4th 1047, 1050.)

Here, appellant's constitutional rights to be present and represented by an attorney during a critical stage of the proceedings were not violated because, contrary to his assertions, the portion of the hearing following his removal from the courtroom did *not* constitute a critical stage of the proceedings. As appellant acknowledges and the record reflects, the court had already *granted* his *Marsden* motion before he was removed from the courtroom. The trial court specifically stated it was making the inquiry of defense counsel for record-marking purposes. We also disagree with appellant's interpretation of the record that, during his absence, the trial court "determined, prior to the hearing on appellant's new trial motion, that any motion for a new trial lacked merit." The trial court did not make any such determination. When appellant was brought back into the courtroom, the court tried to explain that, although the *Marsden* motion was granted, it was not on the ground asserted by appellant; i.e., that he should receive a new trial because his counsel did not adequately represent him. In this regard, the court stated it was "not granting a motion for new trial here" because it did "not find incompetency of

1   counsel." This was an accurate description of the court's ruling. It was not, as appellant
2   asserts, a finding by the court that any subsequent motion for a new trial based on a claim
    of ineffective assistance of counsel would be denied.

3           Nor is there support for appellant's suggestion that his absence prevented him
    from challenging his former counsel's responses to the court's inquiry into his claims
4   against her. Appellant's new counsel presumably had access to the record of the hearing.
    If grounds existed for challenging her explanations, appellant could have had his new
5   counsel present them in connection with his motion for a new trial. Nothing about the
    court's ruling on the *Marsden* motion precluded appellant from later raising the issue of
6   ineffective assistance again in connection with his motion for a new trial.

7   (See Answer, Ex. B.)

8           In Rushen v. Spain, 464 U.S. 114, 117 (1983), the Supreme Court recognized that "the

9   right to personal presence at all critical stages of the trial ... [is a] fundamental right[] of each

10  criminal defendant." In Kentucky v. Stincer, 482 U.S. 730, 745 (1987), the Supreme Court held

11  that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that

12  is critical to its outcome if his presence would contribute to the fairness of the procedure."

13  Implicit in these holdings, however, is the limitation of that right, which is a defendant does not

14  have the right to be present at non-critical stages of the trial.  See Snyder v. Massachusetts, 291

15  U.S. 97, 106-107 (1934).  A violation of a criminal defendant's right to be present is subject to

16  harmless-error analysis.  See United States v. Marks, 530 F.3d 799 (9th Cir.2008); Rice v. Wood,

17  77 F.3d 1138 (9th Cir.1996).  An error will be deemed harmless unless it has a "substantial and

18  injurious effect or influence in determining the jury's verdict." Rice, 77 F.3d at 1144 (internal

19  quotation marks omitted).  Nevertheless, "forfeiture of even the Sixth Amendment right to be

20  present at trial [is justified] – if, after being threatened with removal, a defendant 'insists on

21  conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his

22  trial cannot be carried on with him in the courtroom.'" Indiana v. Edwards, 554 U.S. 164, 185

23  (2008), *quoting* Illinois v. Allen, 397 U.S. 337, 343 (1970).

24          In this case, the state court reasonably determined that the hearing conducted outside the

25  presence of Petitioner was not a critical stage of the trial.  Petitioner had already been granted his

26  Marsden motion at the time he was removed from the proceedings.  The hearing was conducted

27  in order that the court could hear from counsel without the constant interruptions and disruptive

28  behavior of Petitioner.  Contrary to Petitioner's assertions, the Court made no determination with

1  respect to his allegations of ineffective assistance of counsel.  As noted by the appellate court, the

2  trial court stated that the <u>Marsden</u> motion was being granted on the ground that the attorney-

3  client relationship had irreparably broken down.  However, the trial court wanted counsel to

4  respond to Petitioner's allegations to provide an appropriate record.  Certainly, the court made no

5  findings as a result of the hearing which precluded Petitioner from later raising a motion for new

6  trial based on ineffective assistance of counsel.  Therefore, Petitioner's presence at the hearing

7  was not critical to the outcome of the criminal proceedings.  Moreover, given Petitioner's

8  continued disruptive behavior, his removal from proceedings was entirely consistent with the

9  Sixth Amendment.  <u>See</u> <u>Indiana</u>, <u>supra</u>, 554 U.S. at 185.  In addition, any error was completely

10  harmless since Petitioner's <u>Marsden</u> motion was granted regardless of his removal from the

11  hearing.

12    Accordingly, the state court rejection of this claim was not contrary to or an unreasonable

13  application of clearly established Federal law as set forth by the Supreme Court. The claim must

14  be denied.

15  IV. <u>Certificate of Appealability</u>

16    A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

17  district court's denial of his petition, and an appeal is only allowed in certain circumstances.

18  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

19  whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

20    (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
   district judge, the final order shall be subject to review, on appeal, by the court
21  of appeals for the circuit in which the proceeding is held.

22    (b) There shall be no right of appeal from a final order in a proceeding to test the
   validity of a warrant to remove to another district or place for commitment or trial
23  a person charged with a criminal offense against the United States, or to test the
   validity of such person's detention pending removal proceedings.

24

25  (a)  (1) Unless a circuit justice or judge issues a certificate of appealability, an
   appeal may not be taken to the court of appeals from–

26     (A) the final order in a habeas corpus proceeding in which the
   detention complained of arises out of process issued by a State
27  court; or

28     (B) the final order in a proceeding under section 2255.

22

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment and terminate the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:    **May 21, 2012**            **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE